Attorney for the appellant. Good morning your honors, Russell Ainsworth on behalf of the plaintiff Donnie McGee. Thank you. Appellant, you may proceed. By the way, the microphones are solely for purposes of recording the audio tape. Whether or not they're working as a PA system, I don't know. So keep your voice up so we can hear you. Good morning, your honors. May it please the court. Your honors, this court should order a new trial in this case because the trial court committed several serious errors that severely compromised the verdict. First, the court refused to voir dire a juror who brought internet research into the jury room. Second, the court committed evidentiary errors, including allowing the jury to hear unsubstantiated allegations and baseless expert testimony that one of the officers had fabricated confessions before. And third, the court allowed punitive damages awards against the officers, despite the officers' tort immunity from punitives. This morning I intend to focus my remarks on those three issues. With respect to the remaining issues, we would rest on our briefs unless the court has questions. Turning first to the juror issue, in the course of the trial, the trial court learned that Juror Freeman had performed internet research, found an article on memory lapses, which was a subject that testimony had been heard on the case, brought it into the juror room, and more than one juror saw her with it. Despite this, and despite the fact that she did not admit to having done so when questioned by the court room, the trial court refused to ask her any questions whatsoever on the subject. It would be unprecedented for this court, there is no other case, to approve a trial court's complete failure to ask a single question when there is known extrinsic evidence in the jury room. Well, the court, the court, when notified of the situation, did in fact read or re-read an admonition that was given earlier during voir dire. And the record reflects that when this came to the court's attention, essentially that instruction was re-read. Quote, the use of cell phones, text messaging, internet postings, internet access devices in connection with your duties violates the rules of evidence. You're prohibited from using them. You should not do any independent investigation or research on any subject relating to the case that you may have seen or heard. Out of the court room is not evidence. Any press, radio, television programs are also including any information available on the internet. Such programs, reports, and information are not evidence and your verdict must not be influenced in any way by such material. So didn't that cure the problem? No, Your Honor, it did not. Why not? Because the court, the juror had already ignored that instruction once. Reading it a second time blindly without knowing the facts, it's possible that that might have cured the situation if the court had found out what the facts were. But there was so much that was unknown that the court didn't know that it cannot be said with certainty that that cured any possible prejudice the court that had occurred from there being an article on a subject in the case in the jury room that more than one juror had seen, potentially read, which the court didn't know the effect that it had on that juror, nor did the court know the effect it had on any other juror. If the court had asked So you're saying the horses were out of the barn? Right. There was an article there. What should the court have done? The court should have brought the juror out at the very least. Every other case that this court has decided, at the very least, the court has cases, the new trial was still required because the court didn't do more. But this court didn't even get on to that scale. This court didn't even take the first step. This court just buried its head in the sand and hoped the problem would go away. Now, if the court had done, asked the juror questions, it might have turned out to be innocuous or it might have turned out that that juror was so prejudiced that she should have been And that alternate could have taken that juror's place without compromising the whole trial. But because the court did absolutely nothing, then that wasn't possible. And instead, the case went to verdict with extrinsic evidence in the jury room of unknown effect. It is Mr. Magee's burden to show that it is obvious that no prejudice accrued to defendants from that evidence. And he cannot satisfy that burden in a case such as this when we don't know a single fact about what happened. So at the very least, for this court to approve what the trial court did, the trial court should have had some basic information about what had happened. Counsel, you mentioned intrinsic versus extrinsic. Are you saying that this was intrinsic evidence? I might have misspoken, Your Honor. I meant extrinsic evidence, not intrinsic. Okay. And is there a distinction between those two in the case law? There is, Your Honor. With respect to extrinsic evidence, it's evidence that is outside what's going on with the jury itself. There are cases that speak of intrajury biases, something that the court, you know, a witness talks to a juror, a juror might have internal biases, that type of thing. And that's treated differently from evidence. The problem with extrinsic evidence is that it's one of our, you know, the fundamental principles of our judicial system that when, that both sides get to hear all the evidence and get to confront the other side's evidence. So when there's extrinsic evidence about the case that's in the jury room that one side doesn't get to hear, that's problematic because we can't confront it. Is there a presumption that extrinsic evidence is prejudicial? Yes, Your Honor, there is a presumption that it is prejudicial for that very reason, because the other side isn't going to have a chance to confront whatever it is. That's going to influence the juror, potentially form impressions in that juror's mind that defendants could have perhaps confronted if we had known about it, but didn't have a chance to do that. That's not fair. So because of that, there's a presumption that evidence is prejudicial. And as long as it relates to something at issue in the case, which here it did, then the burden shifts to the party, the other side, to show it's obvious that it didn't, you know, that it didn't have an effect. In this case, either defendant, either the plaintiff or you could have asked to see it. Is that right? You don't know who's prejudiced. Right, exactly. At that point, we didn't know who was prejudiced. And our, the defense counsel urged the court to find out. Mr. McGee's counsel urged the court not to ask any questions. But you're right. Both sides could have been prejudiced by it. We just don't know. Well, let's assume from what we read in the record, most probably this juror made an Internet investigation on the issue of memory lapse. Well, is memory lapse such a strong, vital issue in this case that a reversal is demanded? Well, Your Honor, it was an important issue in the case. There had been testimony from several witnesses about it. And Mr. McGee's ability to recall information is tied up with his credibility. And that's the issue that's at the heart of the case. It's tied up with, if it, for example, if the juror had found an article on memory lapses that said being hit by the head, on the head by a bottle, could potentially eliminate your Mr. McGee could not have possibly recalled details about a crime in the way that the officers testified. Because they didn't just testify Mr. McGee confessed, they testified that he told them a number of very detailed things. So if it were impossible for someone with memory lapses to recall information like that, it could have called into question the officer's account. And the point is that it's unknown. And Mr. McGee's, therefore, it's Mr. McGee's burden to show it's obvious the prejudice, it just has to, could have influenced the verdict. It doesn't have to have influenced the verdict. And we don't have to show that. It's Mr. McGee's burden to show it obviously did not influence the verdict. He can't do that when we don't know the subject matter. If she had brought in the article, showed the court, it could have been innocuous. But we just don't know. Counsel, what about your opponent's argument? This wasn't a crucial issue in the case. This was maybe an issue, but not a crucial issue. Well, our, the case law doesn't, I mean, some of the cases do use the word crucial. But we quote from several cases, including the Thornton case, that says the information just has to relate directly to something at issue in the case that the losing party did not have the opportunity to refute. And that may have influenced the verdict. This was something that happened in the case. There was testimony from Mr. McGee, from his sister, from his defense attorney. He was sent out during his criminal trial for a mental health assessment because, according to the defense attorney, quote, something about black, he was complaining about something about blackouts. So the jury heard all this, and obviously that prompted Jura Freeman to wonder what, you know, memory lapses were about. So with that article on that subject, that there was testimony on that could potentially, could have influenced the verdict because it went to Mr. McGee's ability to recall and his ability to, you know, testify or to give information. That's the issue at the heart of the case. I mean, it's not just, you know, how does the trial process work or what is a juror's role. It's about something there was testimony on, and that should be enough for the court to make inquiry. Again, it could have been innocuous. Yes, so there is no case, literally, from this court where either the court didn't ask any questions and this court approved it, or where there was just a curative instruction that was read. Usually this comes up in the context of after the trial, so it doesn't usually come up during the trial. But in the few cases where it does come up during the trial, what the courts did in those cases is actually made inquiry of the juror. They didn't just blindly read the same instruction that the juror had already ignored. If the court had, you know, investigated, the problem might have been with removing the juror, but that didn't happen. So turning now to the next issue, which is the unsubstantiated allegations and expert testimony on the supposedly fabricated prior confessions, of course, prior bad acts are inadmissible because the jury could draw a propensity inference from those bad acts, that someone had done something bad before and therefore did it again. Here, Mr. McGee was allowed to tell the jury that Officer Bartek had fabricated confessions before, but there was no evidence about that at all. It was simply allegations from Mr. McGee's counsel during the cross-examination of Mr. Bartek and his argument during closing, and at other points, that Officer Bartek was a serial fabricator. This allowed the jury to find for Mr. McGee potentially on a propensity assumption that he had done it before and therefore he did it again. This wasn't admissible within any exception to prior bad acts. It was not modus operandi because that is evidence, first of all, there needs to be proof that someone has done something before. Second, there has to be proof that what the person did before was so unique and similar to what's going on in the current case that there is a permissible inference that because the person did it before in a unique way, it also was done again. That's not relevant here because there is no evidence, one, and two, nothing that Mr. Officer Bartek did before is supposed to be unique. Let me ask you, during the trial, was the term fabricated used all the time or was there a different term like obtained confessions or something other than that? Well, the expert testimony, which is also problematic, his opinion was that Officer Bartek either fabricated confessions or acted too confrontational during a pretest. But the expert could not choose between those two possibilities. Each was equally likely and it was only based on the number alone of the confessions. So, yes, the term fabricated was used a lot and that was based on the number. So, yes, obtaining confessions, there was evidence about the number that Officer Bartek obtained and the conclusion that Mr. McGee's counsel and also their expert drew was that because of the sheer number, they must have either been fabricated or Officer Bartek was too confrontational. But if the expert can't choose between two equally likely possibilities, then it was inappropriate for that expert to go before the jury because the jury, we cite cases where if there's two equally permissible inferences from the same evidence, then the jury shouldn't be allowed to speculate which one. In this case, even the expert couldn't speculate which one was correct and as a result, that was impermissible expert testimony. Is this some kind of a science? And was this expert qualified as an expert? I believe he was qualified as an expert in the manner of conducting polygraphs, but not in terms of what it takes for an expert to be an expert on that subject. He was an expert as to how the polygraph process is supposed to work, but it is agreed by both sides. There was no polygraph here. So that was irrelevant. There was no pretest interview. According to both sides, Officer Bartek just stood up and that was the end of it. There was never a polygraph or a pretest given. So there was severe prejudice from that. And again, we cite cases that say prior bad act evidence is so prejudicial that simply admitting it when it's incorrectly admitted calls for reversal. So we urge reversal on that ground as well. The final issue is regarding the tort immunity. And we urge the court to decide based on the plain language of the statute. It's a case of first impression for this court. The federal courts have decided and recognized the immunity for police officers executing their police duties. More of the case is that police officers find the immunity than don't find the immunity. And we explain in our brief why those cases are more persuasive. But the plain language, this fits within. And the Reese case, which is the seminal case on the matter, defines the public official as someone who exercises discretion performing uniquely governmental functions. And that fits police officers. Even Mr. McGee's cases define it that way. And second, police officers also serve in an official executive capacity, which Reese defined as endowed by executive authority with the power to effectuate and enforce the law. And again, that fits police officers' duties. Mr. McGee distinguishes between official capacity and individual capacity. That's not in the statute at all. And in addition, the statute looks only to the capacity in which the public official is serving, not what capacity they are potentially sued in. So again, we urge the court to follow the plain language. And Counsel, can I ask you, does your opponent say Reese was wrongly decided? That is my understanding, that they disagree with Reese. They cite that the case is too old. It was 16 years old. But they don't explain why that was incorrectly decided. That case is followed by a number of other federal courts. And the ones that don't follow it don't really distinguish it. They just, for other reasons that we explain in our brief, they find that there is an individual capacity distinction in the statute that doesn't appear there. Do you want to save some time? Yeah, I do. Do you have any questions? Thank you. Thank you. Appellee. May it please the Court. Your Honors, we are here because the defendants were found guilty of forcing a man to commit a crime. And we are here to ask the Court to allow the defendant to spend three and a half years incarcerated for a murder he did not commit. And that can't be lost on the Court in this instance. And I want to cover the ground that Counsel covered in her opening address to the Court. But I also want to talk about why this case was not close. But first, let's talk about the juror issue. And we begin, memory lapse was never even an issue in the case. To be an issue of dispute on the matter. Nobody disputed. Both sides admitted that Donnie McGee never suffered from any kind of memory lapse relevant to any of the events in this case. The only time memory lapse came up was that he had used it as an excuse on prior occasions to, you know, excuse bad conduct or something like that. But both sides agreed about that. Plaintiff Donnie McGee testified that he had used it as an excuse. But the judge did not testify that he had used it as an excuse. And that's the only time memory lapse came up, and I'm not going to go into more details on this issue. It came up in the questioning by Officer Detective Farley, didn't it? And what Detective Farley tested what the defendant's version was that initially Donnie McGee said that he may have committed the murder but blacked out and didn't remember it. But then the officers said, then was never mentioned at trial and was never an issue at trial. And that is that maybe Donnie didn't have enough memory. Maybe he was having memory lapses and thus couldn't have made such a detailed confession. Donnie McGee took the stand for two days in this case, never suffered from any memory lapses in the case. The jurors were able to see his testimony, and the defendants never argued once during the entire course of the case that he was somehow unable to confess in the detail that he did. Counsel, let me ask you this question. As far as the civil case for malicious prosecution, isn't part of the prima facie case that a person subject to judicial proceeding to which there was no probable cause? Yes, Your Honor. And could it be argued that there was probable cause to charge this man because of this statement that he made that he did have blackouts and may have done it? He denied making that statement, so that was a disputed issue. But we're looking at why he was arrested and why he was charged and not a conviction. At trial, defendants agreed and stipulated in each of their testimony that absent a confession, if you believe that Donnie McGee did not confess, then there is no probable cause. Donnie McGee denies saying he could have done it, he denies saying he did it, he denies saying that any of the confession is true whatsoever, including the portion where the defendants are saying that he did not confess, and he denies saying that he did not have blackouts. I mean, his own attorney testified that he said something about blackouts to him, didn't he? No. What Sam Adams, Sr., and he was the attorney who handled the case, what he testified to was that at the point that he sent Donnie McGee to be examined was when the state indicated that it was going to seek the death penalty against him. And because he saw in the confession a statement that they, about the blackouts, he then sent Donnie McGee to be examined, which is something that he did with any client who was facing the death penalty so as to make sure that all bases were covered. And it wasn't, there's nothing in the record to support this contention that Donnie McGee was suffering from blackouts or that there was any kind of dispute about that. And that colors what the trial court did in this case. Because when you're looking at the discretion accorded to the trial court on situations where you've got a fluid environment, you've got, you know, a jury trial on violence, many complex balancing factors, and there's a concern, as our Supreme Court has said in Runge, that you have a concern that if you ward DR on every issue, you have run the risk of highlighting that issue. If you bring jurors out to ask them about memory lapse, you run the risk of making memory lapse an issue in the case where it was not an issue to begin with. Counsel, could you address why you believe the Court's second admonition was sufficient to cure the problem of memory lapse? I don't believe it was sufficient to cure the problem in this trial. There's two reasons. One, we assume, we presume that jurors will follow instructions by the court. And although defendants argue that we already know that she didn't follow the instruction the first time, by that logic, every curative instruction would fail. Because you would be saying, oh, well, if somebody didn't follow it one time, then it wouldn't be followed again. But the other thing, and why we know the curative instruction was sufficient, is because, as in Runge, we have a jury that is not afraid to speak out to the courtroom deputy if there is something going on that they think should not be going on. And they brought it to the deputy's attention, and after that point, after the point But then when the court directed the deputy to return to the jury room, no one would fess up. The other jurors indicated that it was Juror Freeman who was, and the other jurors were communicating to the deputy. If anything happened after the curative instruction was given, until the end of the trial, the fact that no juror mentioned anything to the courtroom deputy is evidence in the record that Runge has said we can use to make an inference that there is no further misconduct committed in the case. In addition, at the conclusion of the evidence, the jury is instructed on what is and what is not evidence. Counsel, do you agree that Thornton says that there is a presumption that evidence is prejudicial if it comes in on an extrinsic manner? Only if the issue bears on a crucial issue in the case. And then I made an issue in my brief about, because the court says if it may have influenced the verdict, I think is the language. So it has to may have influenced the verdict in order to get that presumption, which then becomes rebuttal. So for all intents and purposes, yes, there becomes a presumption, but it doesn't, it has to bear on an issue crucial to the case. But we also have the factors here. Whether or not to voir dire the jury is something that's vested in the trial court's discretion, and the trial   And in this case, the jury was instructed that no reasonable person would ever think that giving a curative instruction and then speaking to juror Freeman on the Wednesday following, observing her demeanor, observing the kind of person that she was, and choosing not to make it more of an issue, was wrong. That no reasonable person could come to that conclusion. Are you suggesting that the argument was waived? I argue that because the defendants agreed to the curative instruction, that once you're looking, once you're talking about Wednesday, you can't look at just Wednesday. I agree the defendants would have a stronger argument if the facts, if we had the facts on the Wednesday without Friday having ever occurred. But didn't the court direct preparations of memorandum of law on the matter, and the objection was again renewed in post-trial motion? That's correct, Your Honor. So how could we say it's been forfeited? Well, because they had the opportunity, if they wanted to do additional voir dire on the Friday, they could have done it. And essentially, Your Honor, my strongest argument is that the, when you're looking at it on Wednesday, you can't ignore what happened Friday, and I think that's what the defendants like to do, and that's what they're arguing in their brief. That you can, you're pretending that no curative instruction was given, and that nothing was done to address the issue. Something was done, and it was done with the defendants' agreement. And then when you come to Wednesday, you've got the background where the issue has already been addressed, and now should we delve into it more, when it's not a crucial issue in the case? Or even an issue at all? In the record, isn't it? I believe it's stated in the record that the attorney said, we'll take this one step at a time. Right. And we took it one step at a time, and what we agreed to on Friday, what both side parties agreed to with the court, was that we'd given a curative instruction to the jury, to the entire jury. Nobody had any questions about that, none of the jurors expressed any problem with that. And the jury was inquired as to whether they had any issues with it. So this information is out there. We don't know if it favored you or the defendant. When the information is out there, why wouldn't we all want to know what it is? The trial judge, and then give it to the attorneys and say, make your argument. Because on the Friday, both parties agreed that it was not something significant enough to require the jury to be brought out in a court hearing. The reason why we don't need to know is because memory lapse was not a crucial issue, it was not an issue in dispute. If it was an article about how to We don't know what the article was. Correct. We only know what's in the record, Your Honor. I'd like to address the issue in regard to the statutory interpretation of Section 2-102 of the Tort Immunity Act. And in reviewing the briefs, I think one issue that's been lost is that it's the defendant's burden to point to a construction of the statute that would immunize them. Because immunities such as the Tort Immunity Act are in derogation of the common law principle that you should be able to be made whole. And so we narrowly construe the Tort Immunity Act against the governmental actor. And one thing that even the Reese Court agrees is that the second sentence of Section 2-102 is not a model of clarity. I don't see how you can apply the plain language of the statute in any way. The statute is ambiguous. You need to look in the context of which the statute is raised. And I urge the Court to look at the statute as a whole, all of the subsections of the statute. Look at how Part 1, where Section 2-102 arises, is in the section of the statute talking about local public entity immunity. Section Part 2 of the statute talks about public employee immunities. The definition that defendants are urging is a definition that would cover every employee. Every employee would be covered because the case law that they cite and that the Reese Court cites talks about how every act of discretion that every governmental actor uses discretion in virtually everything that they do. And so what defendants are trying to urge is that public official become public employee. And that's not what the statute, that's not the language of the statute used. The legislature knows how to make a statute clear. It did it in 2-202 where the statute talks about there needing to be willful and wanton conduct. But counsel, what Illinois case supports what you're arguing right now? This is a case of first impression, Your Honor. This is this State's first time to say what the statute means. And that is very important. Although Federal courts have interpreted it, obviously. Federal courts have interpreted it. Do you think Reese was wrongly decided? I do, Your Honor. None of those Federal decisions was ever reviewed by any appellate court. So you've got one judge opining about what he thinks. And Reese went wrong in several points. What Reese starts out is trying to distinguish between 2-201 and 2-102, the two statutes mainly at issue. But the court got, interpreted 2-201 wrong. The court thought that 2-201 granted immunity to all employees who are using discretion. And that's not what 2-201 says. It's only public employees who are making decisions of policy that exercise discretion. So it's a much more limited scope. And that sent the court and Reese into a wrong direction because then the court tried to look to the common law of what a public official should, or what a public official immunity. But that common law of public official immunity has been incorporated into the Tort Immunity Act. And has been incorporated into the Tort Immunity Act by using the words public employee, not public official. Then Reese defined public official to be basically a public employee who is exercising discretion, i.e., a public employee, i.e., every public employee who's acting in the scope of their authority and in the scope of their employment. Those terms of art, public employee, use of discretion, and scope of employment are all terms that are found in the Tort Immunity Act. The legislature expressly chose not to use those terms of art in Section 2-102. What we have here is a interpretation granted, urged by the defendants that would immunize every public employee for any act taken in the scope of their discretion. A police officer could beat a man to death and the survival action would have no opportunity for punitive damages under the interpretation urged by defendants. A social worker could take a 6-year-old girl from her home and in her discretion bring that girl to a known child molester's home, leave that girl with the child molester, and not face any kind of liability for punitive damages. That is not what Section 2-102 is saying. And if the legislator wanted to have such broad immunity given to every public employee, it would have used the language that it used in the other context to grant broad immunity to public employees, particularly for compensatory damages. I want to talk briefly, Your Honor. I know my time is running short, but I want to talk about two quick topics. One is that in regard to the polygraph operator, just to be clear, the idiosyncratic method that we're talking about is that in pretest interviews, you're supposed to be non-confrontational. You're supposed to make the person feel comfortable, secure, so that the results of the test are not messed up by the person being overly nervous or concerned. And so when you get 111 confessions in this period of three years, when you're supposed to be non-confrontational, then our expert, who is the president of the American Polygraph Association, who was hired by the United States government to train polygraph operators in Afghanistan and in Iraq, who is taught all over the country, who trained who the city of Chicago hired to train Bartik, he says, that's impossible. In my career, I've gotten between two and five confessions during the pretest interview. It just doesn't happen. So I don't know how he's doing it. All I can tell you is that it's either he's being confrontational during his pretest interview or he's fabricating it. Defendant Bartik then takes a stand and says, I wasn't being confrontational. He's eliminating one of the two possibilities. He's saying, absolutely not. And a jury can then use that information that's provided from the expert to make the to understand why defendant Bartik's innocent construction. And look at the cases talking about when a person, for example, a sexual offender, says my contact with the victim was innocent. Nothing went wrong in my contact with him. It is then relevant that that same person had three other contacts with similar victims. And in those contacts, something did go very wrong. And so when somebody puts that issue, when they're saying there's an innocent construction to what happened here, it is then relevant that this is not your innocent construction of your contact with the person that you were interviewing. It wasn't innocent. And we have the evidence to show it. The last point that I want to talk about is that this was in several manners. One, we've got DNA evidence. The phone, in this case, was left off the hook, placed on top of a loaf of bread. We know the victim died between 10.30 and 1 o'clock on that Saturday morning because she called her hairdresser at 10.30 and then from 1 o'clock on, her phone was busy until she was found three days later. That phone was left off the hook. There was a reddish-brown blood stain on the handle that had two DNA profiles. One was consistent with the victim, and the other was a male that was not Donnie McGee. We've got the pathologist. So that would say how old that specimen was. The victim lived alone. She was a 70, I think, two-year-old woman. She had no male member living in the house, and she was a meticulous house cleaner. She kept the place sparkling clean. She would not have left blood on her telephone. Was it conclusive to be blood? It was a reddish-brown stain, Your Honor. Right. So it wasn't conclusive to be blood. No, but it had DNA that was consistent with the victim's DNA. We've got the pathologist, and the pathologist said that the victim had to be incapacitated before she was killed, before she was stabbed, because the three stab wounds all came in this location on the victim's neck, and each was within an inch of the other. The only way, even if you're restraining somebody, you can stab someone in such tight quarters as if the person is incapacitated, because otherwise just your natural involuntary movements would move your neck to protect it, because it's so vital to your survival. There was also evidence of strangulation. The victim had hemorrhaging in the back of her tongue, which is consistent with when someone's being strangled, they push their tongue as forward as they can in their mouth so as to try to breathe, and so you get hemorrhaging in the back of the tongue. The pathologist saw that and saw the signs of incapacitation. Did not include that in his report, because it was not how the victim died. The victim died from the stab wounds. But this was information not known to the defendants when they concocted the confession, and it was contradicted by the confession. We've got the phone records. Donna McGee made phone calls to all six of his groomsmen the day of the murder, over a course of about three hours. He was calling them to remind them to pick up their tuxes for his wedding later in the month. We've got, please finish up, you have one minute. We've got Donna McGee's lawyer, this is a guy who met Donna McGee one time in his life, John Naughton, who came to the police station and said Donna McGee did not confess to me. This was after Donna McGee had supposedly confessed. He said, I met with my client, I went over what he did that day. I would have gone over what he did that day to try and concoct some kind of false alibi from my client. He never told me he confessed. There was no none of our conversation had anything to do with that. They were telling me how I supposedly did it. We've got Natalie Castillo, who was estranged from Donna McGee at the time, who did not like Donna McGee by all accounts. Farley told her that Donna McGee had stabbed the victim in the stomach and that the victim had confronted him with a knife when he had gone in to steal money. Both of those facts later come up in the confession and they're not probable facts. That's not my point. My point is that they predated when the confession was fabricated by defendants and Natalie Castillo had that information. They talked 25 times. He was winning their trust. They were exchanging information freely. Your Honor, I thank you very much for your consideration of this case and I appreciate your time and consideration. Thank you. You have five minutes. I can be brief, Your Honor. Thank you. First, regarding the juror issue, the counsel incorrectly stated that we don't start with the presumption of prejudice. The presumption of prejudice comes first when there's extrinsic evidence in the jury room. And we start with that presumption because there's no ability for the other side to refute it. Once there's the presumption, then you look to whether it relates directly to something at issue in the case or even to the credibility of witnesses, which is the Collins case that we cite in our briefs. This Court would be the first to hold that when there's an article on a subject that there was testimony about in a case, that is not enough to require the trial court to make inquiry beyond just simply giving a curative instruction. Counsel went through a lot of what if it was this, what if it was that, could have been resolved at the time. The curative didn't work because the one that was read is the prophylactic instruction that comes at the beginning of trial. Once there's a problem that crops up, the presumption that jurors follow their instructions falls away. In this case, that presumption was rebutted when there was allegations that a juror had ignored that instruction. And then finally, with respect to whether we weighed the issue, as this Court mentioned, the trial court actually did decide this. It decided at the time of trial, based on briefs, and it decided based on our post-trial motion that it disagreed that a new trial was warranted. So therefore, as appellant, we're entitled to assert that here on appeal. Turning then to the propensity evidence in the prior confessions, the pretest was not, you know, it is true, a pretest interview is supposed to not be confrontational, but there is no evidence whatsoever that Officer Bartek was confrontational in any other prior case. So accordingly, it wasn't relevant to what happened in this case. And so therefore, it should not have been admitted. Mr. Magee is basically arguing that, and his expert, that because of the number alone, it must have been either fabrication and confession. And counsel claimed that because Officer Bartek denied there was confrontation, then it must have been fabrication. But that gets the cart before the horse. Because first, you have to have a factual basis for your testify. It must be fabrication or confession. Only once your expert has the foundation to be admitted, then the expert can be heard. And that's what made this especially prejudicial. There was no evidence of confrontation, and therefore, the jury improperly could have concluded that it was fabrication. That's propensity. Turning then to the immunity issue on punitives, counsel mentioned that the Tort Immunity Act should be strictly construed. Well, he forgot to mention that there's presumptions that disfavor punitive damages and malicious prosecution cases. Counsel mentioned that punitives are, you know, that there's, that it would be terrible if certain factual situations weren't allowed to have punitives. That is a choice that the General Assembly gets to make. If the plain language of the immunity applies to this situation, which we urge that it does, then this court must apply the immunity, regardless of the legislature's choice to immunize punitives in any particular case. So we are not urging that this applies to every single public employee. We are urging only that officers executing their official police duties are public officials within the immunity's plain language. And we urge the court to look carefully at Reese and the number of other cases that it's cited, because that has persuasive analysis in it. We also explain in our briefs why federal civil rights cases where the distinction between individual and official capacity is relevant are different from what's at issue here, which is a state law tort claim. And in state law tort claims, there is not the distinction between the capacity in which the suit is brought. The language of the statute is just about whether the official is serving in the official capacity. And that's what's relevant. Finally, the DNA evidence was briefly mentioned at the end. We argue in our brief why that was inadmissible. Mr. McGee never claimed that he touched the telephone, so it's irrelevant whether he could have or not. And the very presumption, the fact that the jury was allowed to hear that this DNA evidence was an additional reason why this court should reverse the verdict. Unless there are further questions, we respectfully ask this court to order a new trial without the evidence that was inadmissible and also to order the court to recognize the tort immunity of the officers. Thank you. Thank you, Counsel. Thank you, Your Honors. We're taking this matter under advisement. Court is adjourned.